*434 OPINION OP THE COURT
Gerald Adler, J.
There are three motions before this court. The first finds its way to the County of Kings by reason of an order of the Appellate Division of the Supreme Court of the State of New York held in and for the Third Department in Albany, New York, dated June 9, 1982, in which the court ordered that an action pending in the Supreme Court, Kings County, entitled Bay Ridge Community Council v Carey, and the proceeding pending in the Supreme Court, Schenectady County, entitled Matter of Le Blanc, be consolidated into one action and proceeding.
The second motion is of course the action entitled Bay Ridge Community Council v Carey, and the third motion is Matter of Whelan.
All of the petitioners and plaintiffs seek to review chapter 111 of the Laws of 1982 as amended, apportioning and districting the Senate and Assembly of the State of New York, contending that the aforesaid act as amended is unconstitutional and void as a matter of law and they seek an order enjoining the respondents and defendants from implementing said law apportioning and districting the Assembly districts in accordance with said law.
The motions were made returnable at Special Term, Part I, on Friday, June 18, 1982, and arguments were heard all afternoon until the close of court, and are consolidated herein into one special proceeding.
The respondents have made four separate cross motions seeking dismissal of the petitions pursuant to CPLR 3211 (subd [a], par 7) and/or summary judgment declaring chapter 111 of the Laws of 1982 to be constitutional and valid.
The court must first determine if the challenges to the reapportionment plan are justiciable at this time. The respondent, New York State Attorney-General, contends that these proceedings are premature. He argues that Kings County is covered by the Voting Rights Act of 1965 so that any reapportionment plan affecting Kings County must be submitted to the Attorney General of the United States for approval. Until such approval is given, the plan does not become law. Since the Attorney General of the *435 United States has not yet approved or disapproved the reapportionment plan, respondent maintains there is no justiciable controversy. At the same time, the court has been informed, that there will be a decision on that matter this very day, Monday, June 21, 1982.
Both section 5 of article III of the New York State Constitution and section 1 of chapter 773 of the Laws of 1911 empower the Supreme Court to review “an apportionment by the legislature.” It is simply that, which the court now has before it and which is subject to immediate judicial review. Indeed the New York State Constitution provides that “any court before which a cause may be pending involving an apportionment, shall give precedence thereto over all other causes and proceedings” (NY Const, art III, § 5; emphasis supplied). Moreover, petitioning for the coming primary elections is due to begin tomorrow, June 22, 1982. Both the voters and candidates are entitled to a determination as to whether or not the reapportionment plan, as enacted, is constitutional before the gathering of signatures on the petitions. Under all of these circumstances, the court concludes that the controversy before it is justiciable and not premature.
The court will now consider the specific objections to the reapportionment plan.
Petitioners contend that the reapportionment plan violates the State Constitution’s antigerrymander provisions requiring that legislative districts be “compact”, “contiguous” and “convenient” (NY Const, art III, § 5).
The Bay Ridge Community Council are particularly incensed in respect to the boundary lines as enacted in the reapportionment of the 46th, 48th, 51st and 52nd Assembly districts. They point out that the area has in effect been divided and subdivided into various elongated and disfigured shapes and segments and they claim that the new lines as drawn, will have the effect of diffusing the political power of the community and the efficacy of the vote of its citizens. They claim that it requires no great genius to see that a better set of lines more respective of the common interests of the voters in the Bay Ridge area could have been drawn, and that the Assembly districts are neither *436 convenient, contiguous nor compact; that it represents partisan, racial gerrymandering and is otherwise an affront to fairness.
From a lay point of view, there is some degree of accuracy to the charges, as it pertains to the shape of the districts, however, this court must determine whether or not there have been violations of State constitutional requirements within the legal meaning of the terms which have been employed by the petitioners and as they have been interpreted by the New York courts.
The term “contiguous territory” has been defined by the Court of Appeals as “territory touching, adjoining and connected, as distinguished from territory separated by other territory.” (Matter of Sherrill v O’Brien, 188 NY 185.)
The Court of Appeals stated (p 207): “In construing the language of the Constitution as in construing the language of a statute, the courts should look for the intention of the people and give to the language used its ordinary meaning. The ordinary and plain meaning of the words ‘contiguous territory’ is not territory near by, in the neighborhood or locality of, but territory touching, adjoining and connected, as distinguished from territory separated by other territory” (emphasis added).
In Matter of Schneider v Rockefeller (31 NY2d 420, 430), the Court of Appeals rejected a challenge on grounds of contiguity stating: “Petitioners cite us to numerous examples of allegedly noncontiguous districts, many of which are located on or near bodies of water. However, the requirement of contiguity is not necessarily violated because a part of a district is divided by water. (Matter of Reynolds, 202 N. Y. 430, 442-443; Ince v. Rockefeller, 290 F. Supp. 878.) Moreover, in none of the cited examples is it necessary to travel through an adjoining district to keep within the boundaries of the challenged district” (emphasis added).
The 46th Assembly District under challenge here is clearly within the parameters of the Court of Appeals holding. In fact unlike the districts in Schneider (supra), the 46th Assembly District herein is all in one county, and is not divided in whole or in part by water. Like Schneider, *437 it is not necessary to travel through an adjoining district to keep within the 46th Assembly District or for that matter the boundaries of any district in the instant plan. (See, also, Matter of Reynolds, 202 NY 430; Matter of Orans, 17 NY2d 107; Ince v Rockefeller, 290 F Supp 878, 883.)
For more than a half century, attempts to invalidate districting on the grounds of noncompactness have uniformly been rejected by the courts. In Matter of Dowling (219 NY 44), the Court of Appeals, although severely pressed by counsel to reject the plan on grounds of noncompactness, refused to declare the Senate districts violative of the constitutional requirement of compactness. The court stated (supra, at p 58): “It is also claimed that the constitutional provision in regard to compactness has been violated in the counties of New York, Kings and Westchester * * * The constitutional provision does not provide unqualifiedly for compactness [emphasis added]. Senatorial districts are not required to be in the form of geometric figures, as a square or perhaps a circle. Such a provision would be impractical and impossible to carry out. It is expressly provided that the districts shall be as compact as practicable. This permits of a consideration in good faith of existing lines, topography, means of transportation, etc.”
In Matter of Richardson (307 NY 269), the Court of Appeals again rejected an attack on the compactness of districts.
In reviewing the issue of compactness, in addition to the Dowling interpretation as noted above, it is important to remember that the population of New York State is not spread across the State in neat geometric patterns but varies considerably in density even within metropolitan areas. This fact was recognized by Justice Conway in his opinion in the Schneider case when, after noting the odd shapes and sizes of the political subdivisions of the State and the problems involved in shifting populations, he stated (68 Misc 2d 869, 874): “This court must take judicial notice of the fact that New York State is one of the oddest shaped States in the United States. The court must also acknowledge the fact that the political subdivisions of the State, the counties, towns and cities, also have odd shapes and sizes caused by many and various factors such as coast *438 line, rivers, lakes and mountains. We have a State that defies a uniform physical subdivision. We also have a large population that is forever shifting due to industrial relocations, urban renewal, public housing projects, relocation of highways and the population expansion requiring the establishment of new residential developments in new areas. Therefore, the Legislature must deal with one of the most difficult ‘jig-saw’ puzzles in the world. Not only are there 210 Senate and Assembly districts or ‘pieces’ to the puzzle, but they change in size and shape after each census. It is the job of the Legislature to adjust the pieces every time the Federal Census figures become available and then try to put it together again. The Legislature must keep each Senate and Assembly ‘piece’ as nearly the same exact population as is possible and yet make it fit without creating any arbitrary adjustments that offend race, creed or national origin standards, nor violating the State Constitution any more than is required by the ‘one man, one vote’ Federal constitutional standard.”
The Appellate Division in Matter of Schneider (38 AD2d 495, 499) stated: “While it is true that some districts result in oddly shaped designs, the requirement to meet population equality leads of necessity to such an end.”
The Court of Appeals, in unanimously affirming, stated (31 NY2d 420, 429-430):
“The term ‘compact’, on the other hand, has no precise meaning within the context of the constitutional mandate. Moreover, the Constitution does not provide unqualifiedly for compactness. (Matter of Sherrill v. O’Brien, supra.) * * * Particularly where cities are concerned, the requirement of practical numerical equality may necessitate boundaries that are ragged at best. Moreover, it is manifest that our State, with its irregular boundaries, its islands, rivers, lakes and other geographical features is not susceptible of division into circular planes or squares. Thus, it might be said that the constitutional requirement of compactness is peripheral in its thrust, forbidding a complete departure, yet leaving to the determination and discretion of the Legislature the degree of compactness which is possible in the total representation picture.
*439 “Similarly, numerous districts are challenged as being non-compact. But as we have noted, the requirement of compactness is a practical one and along with the overriding goal of population equality, numerous factors may legitimately be considered in devising a districting plan * * * In sum, although we would agree that some of the challenged districts are, to say the least, irregular in form, none are so aggravated or outrageous as would warrant the conclusion that the Legislature has completely departed from the constitutional standard.” (Emphasis added.)
In sustaining the constitutionality of New York’s 1970 Congressional districting statute, the Federal court, in Wells v Rockefeller (311 F Supp 48, affd 398 US 901), stated (at p 53): “To meet the goal of mathematical equality in a State in which population density varies widely, the Legislature had to cope with boundary lines drawn to accomplish this result. Some recognition was undoubtedly given to the pattern laid out in antecedent plans. However, geometric nicety of design must give way to numerical equality. A series of perfect squares, rectangles or even triangles, each containing 409,324 persons, could not be placed upon a map of New York State so that 41 districts would fit congruously therein. Therefore, curious shapes were bound to result. But it is not for this Court to direct — even if we possessed the competence — the Legislature to straighten a line here, bend it there or include or exclude various towns in a manner differing from the plans as drawn.”
The maps outlining the unaesthetic shapes sustained by the Court of Appeals in Richardson (supra), Orans (supra) and Schneider (supra), were attached as exhibits to the moving papers in support of the motion for dismissal and summary judgment.
The conclusion is inescapable that if those shapes were sustained then the districts involved herein are compact and contiguous as a matter of law.
In attempting to challenge the constitutionality of chapter 111 of the Laws of 1982 upon the ground of “partisan gerrymandering”, petitioners have raised a “nonjusticiable issue” which courts consistently have refused to consider. (See, e.g., WMCA, Inc. v Lomenzo, 238 F Supp 916, 925- *440 926, affd 382 US 4 [see particularly concurring opn of Mr. Justice Harlan, 382 US, at p 6]; Cousins v City Council of City of Chicago, 466 F2d 830, 847; Wells v Rockefeller, supra; Sincock v Gately, 262 F Supp 739, 831-833; Meeks v Avery, 251 F Supp 245, 250-251; Kilgarlin v Martin, 252 F Supp 404, 432; Bush v Martin, 251 F Supp 484, 513; Stout v Bottorff, 246 F Supp 825, 829; Sims v Baggett, 247 F Supp 96; Jones v Falcey, 48 NJ 25; Koziol v Burkhardt, 51 NJ 412.)
The nonjusticiability of partisan gerrymandering disputes is not inconsistent with Baker v Carr (369 US 186). On the contrary, the Supreme Court in speaking of a test for defining a nonjusticiable political question in Baker v Carr, stated {supra, p 217): “Prominent on the surface of any case held to involve a political question is found * * * a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion”.
These criteria of nonjusticiability clearly apply to questions as to partisan gerrymandering. Any attempt by the courts to review the shape of legislative districts with a view towards determining claims of partisan gerrymandering would require them to enter a hopeless morass, in which they would be required to weigh map changes, shifting population densities, topographical barriers, competing political, social and economic considerations relevant to various political subdivisions and communities, and the interrelationship of all these factors with respect to neighboring districts. Whereas apportionment cases lend themselves to a determination by a ready application of available arithmetic statistics, districting cases would require political value judgments that by their nature should be confined to the legislative process.
Moreover, since voters can change their minds, unlike their race, there is not even a readily isolated segment of any political minority to simplify the determination and application of proper districting standards. Thus, unlike Gomillion v Lightfoot (364 US 339), which involved blatant racial discrimination in violation of the 15th Amendment, there is no basis for lifting alleged partisan gerrymander *441 ing controversies out of the political arena and into the conventional sphere of constitutional litigation.
The immense difficulties inherent in any judicial effort to resolve claims of partisan gerrymandering was well described by the Supreme Court of New Jersey in Koziol v Burkhardt (51 NJ 412, supra), where, quoting from its earlier opinion in Jones v Falcey (48 NJ 25, 32-33, supra) the court stated: “The trial court described such issues as non-justiciable. Perhaps it would be more accurate to say such issues are beyond judicial condemnation, not because the controversy is beyond the jurisdictional authority of the Court, but rather because the Constitution does not prescribe a single approach or motivation for the drawing of district lines, and hence the Constitution is not offended merely because a partisan advantage is in view. Indeed, it would be difficult to separate partisan interests from other interests, since partisan interests may well be but a summation of such other interests. In addition it would seem impossible for a court to pass upon the validity of political interests without itself making a political judgment or appearing to do so. For these reasons the view generally taken in this new area of judicial activity is that, if the mathematics are acceptable, it rests with the voters, rather than the Court, to review the soundness of the partisan decisions which may inhere in the lines the Legislature drew.”
These same difficulties were recognized by Circuit Judge Moore when speaking for a unanimous court in Honeywood v Rockefeller (214 F Supp 897, affd 376 US 222), he stated (p 900): “It is impossible for us to speculate, and indeed it is not our function to do so, on why a district line turns to the right at one street and left at another. There are a myriad of possible variations in the drawing of such lines.”
In Matter of Schneider (31 NY2d 420, 429, supra), the identical issue was raised. Petitioners urged “that chapter 11, in effect, dilutes the voting strength of a political element of the population and, thus, violates the Equal Protection Clause”.
The Court of Appeals rejected this attack stating, in language appropos here (31 NY2d, at p 431): “Turning next *442 to petitioners’ equal protection challenge, we conclude that the gerrymandering of special interest groups — racial, social, economic or ideological — is too sensitive and significant an issue to be decided on this record with its bare allegation that ‘Chapter 11 * * * constitutes an attempt to maximize the strength of one of the two major political parties by means of a gerrymander’. Even if we were to assume the justiciability of a gerrymander of a political interest group in the single-member district context, this record does not demonstrate the invidious effects of the alleged gerrymander nor does it address the more basic threshold questions such as the necessary size and degree of common interests a group would have to possess before it would be entitled to protection.”
Even assuming, arguendo, that a claim of “partisan gerrymandering” presented a justiciable issue, petitioners have failed to sustain their burden of proof on this issue. (Wells v Rockefeller, 311 F Supp 48, affd 398 US 901, supra; Fortson v Dorsey, 379 US 433; Wright v Rockefeller, 211 F Supp 460, affd 376 US 52, reh den 376 US 959; Honeywood v Rockefeller, supra.) Petitioner Le Blanc merely avers in his petition that “Upon information and belief the assembly districting plan * * * has been designed to maximize the political power of a particular party”, without offering anything to support such a contention.
Petitioner’s reliance on the dicta in the Supreme Court opinion in Fortson v Dorsey (supra) gives no support to his cause since that opinion dealt only with a multimember apportionment scheme and has no relevance to the single-member districting plan involved in the instant case.
In Gaffney v Cummings (412 US 735) the court held that maintaining the existing political balance may be included as a factor by the Legislature.
Petitioner Le Blanc seemingly claims that the plan herein commits a racial gerrymander. Aside from a passing conclusory reference to the possibility of three black districts in Queens, petitioner adduces no proof to sustain his charge.
The United States Supreme Court in considering the question of racial discrimination in 14th and 15th Amendment cases requires a finding of discriminatory purpose, as *443 opposed to mere discriminatory effects before a districting plan will be invalidated. The development of the intent requirement has basically reflected trends in equal protection analysis in general. (See, e.g., Arlington Hgts. v Metropolitan Housing Corp., 429 US 252; Washington v Davis, 426 US 229.)
Petitioner, who is not a member of a minority group, does not live in Queens County (he lives in Town of Long Lake, Hamilton County), is not aggrieved by either a 14th or 15th Amendment claim and therefore has no standing to sue on the question of race gerrymander. The United States Supreme Court definitively settled this question in Warth v Seldin (422 US 490, 500).
The United States Supreme Court has declared in the landmark case of Reynolds v Sims (377 US 533, 579) that in reviewing any apportionment statute, “the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State.” (See, also, WMCA, Inc. v Lomenzo, 377 US 633, 653, supra.)
It is significant that while the petitioners seek to challenge the constitutionality of chapter 111 on numerous grounds they do not contest the prime fact that chapter 111 has complied with the overriding principle of “one person, one vote”.
Le Blanc argues however that the statute “unnecessarily divides” counties in the formation of Senate and Assembly districts in violation of sections 4 and 5 of article III of the New York State Constitution.
The formulas provided in sections 4 and 5 of article III of the New York Constitution, insofar as they included “a built-in bias against voters living in the State’s more populous counties” were held invalid in WMCA, Inc. v Lomenzo (supra, p 654). In Matter of Orans (15 NY2d 339), the court held that while the constitutional formulas providing for the distribution to underpopulated counties of a large number of Assembly seats without regard to population, plus use of different ratios for Senate seats were invalid, the remaining apportionment provisions of article *444 III remain viable unless it could be shown that they conflict with the basic principle of “one man, one vote”.
The court further recognized that (15 NY2d, at p 351): “The districting outlawed by the United States Supreme Court as well as all former districtings of this State use the county as the basic unit into which both Assembly and Senate districts are molded but it is patent that under the new rules the integrity of all the counties in these respects cannot be complete. This means not only that it will be impossible to give each county at least one full Assembly district but also that the boundaries of districts cannot in all instances be co-terminal with county borders.” (Emphasis added.)
It therefore appears that whatever minor counties were cut, was compelled by one-man, one-vote requirements.
Finally, it should be noted that section 4 of article III of the State Constitution, dealing with the establishment of Senate districts, states that: “no county shall be divided in the formation of a senate district” (emphasis added).
No comparable provision exists in section 5 of article III which deals with the creation of Assembly districts. The conclusion is inescapable, that with respect to Assembly districts there is no county line requirement as there is in the creation of Senate districts.
Petitioner Le Blanc contends that chapter 111 unconstitutionally violates section 5 of article III by separating Hamilton and Fulton Counties into separate Assembly districts. Petitioner’s challenge has no more merit after Reynolds v Sims (supra) than all of the other provisions in section 5 of article III, which Orans (supra) and Schneider (supra) held to be subordinate to the dictates of population equality.
It is well settled that a constitutional provision must be construed with reference to the law existing at the time of its enactment. (New York Public Interest Research Group v Steingut, 40 NY2d 250, 258; Byrn v New York City Health & Hosps. Corp., 38 AD2d 316, 330, affd 31 NY2d 194.) When this particular provision was enacted in 1894, of course, the 14th Amendment imposed no limits on legislative reapportionment.
*445 It is clear that the Fulton-Hamilton provision in section 5 of article III of the New York Constitution was added in the 1894 Constitution was part and parcel of the requirement that each county no matter how small shall have at least one Assembly member. However, the framers of the 1894 Constitution recognized that at that time, the population of Hamilton County based on the 1890 census was only 4,762 — the smallest population of any county in the State of New York. The population of Hamilton County was obviously too small for even the 1894 Constitution to permit having its own Assembly member. Thus, the County of Hamilton was linked to Fulton County to create a more sizeable Assembly district.
However, following the decision of the United States Supreme Court in WMCA, Inc. v Lomenzo (377 US 633, supra) invalidating New York State’s constitutional scheme for the apportionment of Assembly and Senate districts insofar as they violate the equal protection requirements of the 14th Amendment, the New York Court of Appeals in Matter of Orans (15 NY2d 339, 351, supra) recognized that the provision in section 5 of article III requiring each county to have at least one Assembly member was invalid. With the voiding of the one-county one-Assemblyman State constitutional requirement, the provision linking Fulton and Hamilton Counties in the Assembly has no purpose and must necessarily fall.
It must be recognized that a judicial review of a New York reapportionment statute is not a contest to select the “best” reapportionment that can be submitted by any citizen of the State, but is limited to the sole question as to whether the statute before the court passes constitutional muster. As such, judicial inquiry “must proceed with proper regard for the settled rule that a presumption of constitutionality attaches to every statute enacted by the Legislature and * * * That a statute can be declared unconstitutional only when it can be shown beyond reasonable doubt that it conflicts with the fundamental law, and that until every reasonable mode of reconciliation of the statute with the Constitution has been resorted to, and reconciliation has been found impossible, the statute will be upheld.’” (Matter of Fay, 291 NY 198, 206-207; People *446 ex rel. Henderson v Board of Supervisors, 147 NY 1,15-16.) Other courts have similarly rejected attempts by litigants to submit private plans that were asserted to be superior to the statutes before the court. See Sincock v Roman (233 F Supp 615, 619), where a Federal three-Judge court observed: “It is not our duty to determine whether a plan can be worked out that is superior in apportionment to that set up by S.B. 332 and S.B. 336. Our duty is to determine whether the plan set up by the General Assembly conforms to the requirements of the Constitution of the United States.” (See, also, Wells v Rockefeller, 311 F Supp 48, affd 398 US 901, supra; Bush v Martin, 251 F Supp 484, 513, supra.)
This court is of the opinion that chapter 111 of the Laws of 1982 as amended, apportioning and distributing the Senate and Assembly of the State of New York is in accord with all of the subsisting provisions of article III of the New York State Constitution and therefore dismisses all of the proceedings, the petitions and the complaints, and grants summary judgment declaring and acknowledging that chapter 111 of the Laws of 1982 is a valid and constitutional apportionment statute.
The motion for discovery by petitioner Le Blanc is denied.